Daniel, J.
delivered the opinion of the court.
The first question to he considered is that which the prisoner sought to present by his demurrer to the commonwealth’s replication to his plea in abatement, to wit, Whether he had been regularly and legally examined by a competent court of justices for the murder with which he stood indicted? In his petition the prisoner says that his examination was irregular in this, that he was illegally and irregularly committed to jail for examination; because he was remanded under a certificate of Samuel H. Royall, a justice of the peace, acting as coroner in the absence of the coroner, who had no legal authority for such action, in as much as neither a coroner nor a justice of the peace, acting as coroner, is empowered by law so to commit; and that said Royall should have sent him before a justice of the peace, who properly and regularly might and should have committed him for examination of the offence with which he stood charged. And in the argument here the prisoner’s counsel have endeavored to maintain that the certificate was a necessary and essential part of the record of the examining court. That the justices could not legally proceed in the examination without a proper certificate of the nature of the offence; and that as it appeared from the certificate itself, that it was made without legal authority, the proceedings of the examining court were altogether null and void.
In considering the question it becomes necessary to refer particularly to those'provisions of the Code which regulate the arrest, commitment and examination of persons charged with felonious offences; and also those which prescribe the duties of coroners before whom inquisitions of deaths supposed to be caused by violence, are taken; and to advert to some changes made, by these provisions, in the former laws relating to the same subject.
*667 The previous sections of ch. 202, in relation to coroners’ inquests, having pointed out the manner in which the inquest is to be conducted and taken, the 7th section of the chapter requires that the coroner shall return to his county or corporation court the inquisition, written testimony and recognizances by him taken; and if the jury find that murder, manslaughter or assault has been committed on the deceased, the coroner is to require such witnesses as he thinks proper, to give a recognizance to appear and testify at such court when it sets for the trial or examination of the accused. And by the 8th section, if a person charged with the offence by the inquest, be not in custody, the coroner may for his apprehension issue process in the same manner as a justice. The process is to be returnable before a justice and proceeded on as directed by chapter 204. And by the 11th section, in case of the failure of the coroner to act, or if there be no coroner authorized to act, or none in the neighborhood in which the dead body may be found, a justice may act as coroner, and be entitled to the same fees, and be subject to the same penalties.
By the 11th section of chapter 204, it is provided that a justice before whom any person is brought for an offence, shall, as soon as may be, in the presence of such person, examine on oath the witnesses for and against him, and he may be assisted by counsel. And the 15th section of the same chapter declares that when the justice considers that there is sufficient cause for charging the accused with the offence, if the accused be entitled to an examining court, the commitment shall be for examination, and the recognizances be for appearance before such examining court as is provided by chapter 205 ; and if he be not so entitled, unless it be a case wherein it is otherwise specially provided, the commitment shall be for trial and the recognizances be for appearance in the county *668 or corporation court, at such time as the case can he proceeded in before such court. And the justice shall return to the clerk of such court, as soon as may be, a certificate of the nature of the offence, showing whether the accused was committed or bailed therefor ; and the clerk, as soon as may be, shall inform the attorney for the commonwealth in said court of such certificate.
The first section of chapter 205 declares that before a white person charged with a felony is tried before the Circuit court, he shall be examined as in subsequent séctions is provided, unless by his assent, entered of record in such court, the examination is dispensed with. The second, third and fourth sections declare that such examination shall be had before the court of the county or corporation in which the of-fence was committed or may be prosecuted; and may be before the said court at a regular term or special session thereof, as the justice who considers that there may be sufficient cause for charging with the offence the person accused thereof, may in his discretion determine. If the justice determine on a special session of the court for such examination, he is to issue his warrant to the officer of such court, requiring him to summon at least eight of the justices, (if so many there may be,) to meet for the examination of the fact, at their court-house on such day as said justice shall appoint, not being less than five nor more than ten days after the date of the warrant. And it is further required that such court, whether held at a regular term or a special session, shall consist of at least five justices; and that the justice who committed the accused for examination, shall not, without the consent of the accused, constitute one of the court.
By comparing these several laws with the acts of 1847-8, relating to the same subjects, it will be seen *669 that the most material changes made by the Code are in reference to the examining courts. By the act of 1847-8 the called or special sessions of the examining courts were entirely abolished, the 19th section of chap. 15, p. 132, directing that when the accused was entitled to the benefit of an examining court before trial, the magistrate before whom he was brought, should bail or commit him for examination before the next succeeding court of his county or corporation. And by the 18th chapter, p. 138, provision was made for the examination at the next session of said .court by five justices. When these provisions were about to be incorporated into the Code, it was deemed advisable by the legislature to restore to a certain extent, the special sessions of the examining courts; and the committing justice was, as we have seen, vested with the power of calling such court by his warrant, if he should in his discretion, think proper to do so. Ho change, however, was made in the duties of the coroner, in reference to a person who by the inquest taken before him, should be charged with the murder of the deceased; the 10th section of the 16th chapter of the act of 1847-8 before referred to, requiring that if the person so charged should not be in custody, he should be arrested by process issued by the coroner, and carried before a justice, who was to proceed with the case in the same manner that was required of justices of the peace' in like cases; whilst the 9th section of said act which corresponds with the 7th section of chapter 202 of the Code, before cited, directs the coroner to recognize the witnesses to appear at the next county or corporation court for the examination or trial of the accused, and also to return to said court the inquisition, written evidence and all examinations and recognizances by him taken.
It will be seen that neither by the Code nor the act of 1847-8, is any power, in terms, given to the coro *670 ner to commit in any case ; and that the discretion of calling intermediate sessions for the examination of those entitled to the benefit of examining courts, is vested in the justices alone. It is argued that though the provisions of the Code re-establishing the called courts, do not give the coroner power and authority to summon a court for the examination of a person charged with murder by the inquest, as formerly under the act of 1819, he still retains his common law power to commit a person so charged by the inquest, “ if he be present.” It is not improbable that the prisoner was present at the inquest, and that Royall, in committing him as coroner, acted on this view of the law. Whether this view was correct or not, we do not deem it necessary to enquire. For it is well settled by decisions of the General court, made under the former laws, that the warrant of commitment formed no part of the record; and that when it appeared that the prisoner had been regularly examined for the same offence with which he was indicted, the court could not be called upon to investigate the legality of the commitment. McCaul's Case, 1 Va. Cas. 271; Murray's Case, 2 Va. Cas. 504. And in Clore's Case, 8 Gratt. 606, it was decided by the same court, that the principle of the decisions just above mentioned is not at all varied because of the subsequent amendments of the law in the Code, relating to arrest and commitment; that after the finding of the grand jury upon the examinations and proofs before them, charging the accused with the murder, it was no defence in reason or in law to the prisoner, that there had been irregularities in his commitment.
Nor can we see on what ground an effort can be made to maintain that the certificate was without competent authority. For even if Royall acted under a mistaken view of his duties in committing the prisoner by virtue of his supposed power as coroner to *671 do so, such error does not extend to the certificate. The fact that he had undertaken to act on this occasion as coroner in the absence of the regular coroner, did not divest him of his office of justice of the peace. Though for the occasion discharging as coroner the duties peculiar to that office, no power or right of a justice compatible with those duties was thereby taken away. And having just discharged the judicial duty of taking the inquest, and having by his warrant as coroner committed the prisoner, he had the same means before him of certifying as a justice of the peace, the nature of the offence, as could be possessed by any justice in any case of commitment. And when we look at the certificate, we find that his course was in exact conformity with this view of his duties. For whilst it appears by the certificate that he made the commitment as a coroner, the certificate itself is made by him as a justice of the peace. “ I, Samuel H. Royall, a justice of the peace, do hereby certify that acting as a coroner, I committed,” &c. And the certificate is signed by him with the addition, J. P.
The certificate being thus in all respects legal and proper, it is not necessary to express any opinion as to what might have been the legal effect on the rights of the prisoner had it been shown to have been otherwise.
The second assignment of errors is based on an exception to an opinion of the court overruling a motion of the prisoner made at its November term 1851, for a change of the venue. After he had been arraigned and had pleaded not guilty, he made a motion for a change of venue, and in support of it filed his own affidavit and introduced a number of witnesses to prove its statements. In his affidavit he expresses the belief of the existence of such a general prejudice against him and his cause that he could not obtain a fair and impartial trial in the county; and that even if *672 a jury should be brought from another county, they would be so influenced by the popular feeling as to preclude the possibility of his having a fair trial. That threats had been made by some of the people that even an acquittal would not protect him, and that he would be murdered by a mob. That many and influential citizens had raised a subscription and had employed counsel to aid in the prosecution. And that he verily believes that at the period of his examination and commitment, the state of feeling against him and his cause was such, that if one or two leading men present had made the suggestion, he would have been put to death by the violence of the people then assembled.
No decision has been made by our appellate courts in criminal cases, prescribing the rules and principles by which the judges of the circuits are to be governed in disposing of motions for a change of venue. In order, however, to prevent the hindrance and embarrassment to the course of justice, that would be likely to arise from too readily granting such motions, it may be safely affirmed, that the mere affidavit of the prisoner of his fears or belief that he cannot obtain a fair trial in the county is not sufficient to sustain the motion ; but that he should be required to show by independent and disinterested testimony, such facts as make it appear probable at least that his fears and belief are well founded. On the other hand, when such facts are stated and shown by the prisoner, and not successfully opposed or explained on the part of the commonwealth, no arguments of inconvenience or delay should be permitted to stand in the way of the great end to be attained, a fair and impartial trial.
It is obvious also that a state of facts, which, under the former laws regulating the sources from which the jury were to be drawn, might have been conclusive in favor of a motion for a change of venue, might, under *673 the existing statutes, wholly fail to show any difficulty in the way of obtaining a fair trial in the county. For whilst by the law as it formerly stood, the court had no power to send beyond the limits of the county for a jury, no matter what might be the difficulty of obtaining therein a jury free from exceptionj it is now provided by the 10th section of chapter 208 of the Code, that if qualified jurors not exempt from serving cannot be conveniently found in the county in which the trial is to be, the court may cause so many as may be necessary, of such jurors, to be summoned from any other county or coiporation by the sheriff or sergeant or by its own officer. In this state of the law it is difficult to suppose a case in which this court could safely undertake to pronounce erroneous a judgment of a Circuit court refusing an application for change of venue based simply on the ground of difficulty in obtaining jurors for the trial in the county. Cases, however, may be supposed of such strong and extensive and influential prejudice and excitement against the accused, as to endanger the fairness and impartiality of a trial conducted in the county, even though the court should encounter no serious difficulty or inconvenience in obtaining a jury. In such cases, in order to obtain a full, free, dispassionate, just and impartial hearing of the cause, it might be just as important to change the theatre of the trial, as to have a jury filling all the requirements of the law as to qualification and freedom from exception. In view of such a possible state of things, and of the possible existence of other causes not necessarily connected with the jury, and in order to preclude the inference, that, by enlarging the power of the court as to the sources from which the jury might be taken, it intended to curtail the court of any power or discretion which it previously had of changing the venue for causes other than’ the difficulty of obtaining a jury in the county, the legislature have, in *674 the 22d seetion of the chapter cited above, declared that the Circuit courts may, on the motion either of the accused or of the attorney for the commonwealth, or without such motion, for good cause, order the venue for the trial of a criminal case in such court to be changed to some other Circuit court.
With these views of the law we cannot undertake to say, after an examination of the testimony on both sides, that the Circuit court improperly exercised its discretion in refusing to grant the prisoner’s motion. It is true it is shown that subscription papers were circulated to raise a fee for the employment of counsel to aid in the prosecution, and that they had been signed by some twenty or thirty persons. Such a fact, of itself, is no ground for a change of venue. It is a circumstance tending to show the extent to which an opinion of the prisoner’s guilt prevailed; but it is not difficult to conceive how men, just and upright, and free from any ill will or feeling of vindictiveness towards the accused, in view of the fact that much of the ability, learning and eloquence of the bar was enlisted in his cause, might be willing to contribute for the procuring of additional counsel on the side of the prosecution, in order to bring about, as far as might be, an equal litigation and its probable result, justice, as well to the commonwealth as the accused. It is true also it is shown that there had been shortly after the homicide was committed, considerable excitement against the accused in the immediate neighborhood, and that on several occasions persons had been heard to express the belief that the people would not bear with an acquittal: that some who were present at the inquest, and others who were present at the examining court, had expressed the belief that the people would have proceeded to put the accused to death if the suggestion had been made by leading men present; and one of the wit *675 nesses examined on behalf of the application, states that he had heard a person say that if the prisoner was acquitted by a jury he would not be if he was hung before he got far from the court’house; that some six or eight other persons were present on the occasion, who seemed to nod assent: But on the other hand, there is the total absence of proof of any threats against the prisoner; and it was shown that the excitement which at first prevailed had greatly abated, and had at first been confined mainly if not entirely to the neighborhood of the residence of the deceased, and of the plaee where the homicide was committed; and that the expressions above mentioned had been uttered mainly by persons coming from the same neighborhood. And the opinion is expressed by some of the witnesses, in a manner and under circumstances entitling it to the fullest confidence, that if any effort had been made on the public occasions above mentioned, to do violence to the prisoner or in any manner to impede the course of the law, such effort would have been successfully met and opposed by the people there assembled. And as to the jury, the testimony was clear to show that the court would probably meet with no serious difficulty in obtaining one, from the remote parts of the county, free from all exception. In this state of things, we do not think the court erred in refusing to change the venue.
At the November term of the Circuit court 1852, after the venire had been exhausted and one juror alone found qualified, and the attorney for the commonwealth had moved the court to award a venire facias to bring other qualified jurors from another county or corporation, the prisoner renewed his motion for a change of the venue; the refusal of the court to grant which, is the fourth ground of error taken by the prisoner in his petition.
*676 The prisoner, in his affidavit, relies on his former affidavit and on the proofs offered in support of it. He repeats the expression of his belief of a great and violent prejudice against him and his cause. He states that on a former trial between three and four hundred persons had been summoned for the trial of himself and Eeid, who stood jointly indicted with him, and only one panel from all these could be procured for his trial in the county; that at the then present terra twenty-four persons had been summoned as veniremen, twenty of whom had attended and out of these but one could be found who had not expressed such opinions as to disqualify them from serving on the jury. He relies on the fact that the court had found it necessary to order the summoning of jurors from other counties, but expresses the belief that even this precaution will not afford him protection and give him a fair and prompt trial.
The testimony offered, as well on the part of the prisoner as of the commonwealth, is conclusive to show that it would have been very difficult if not impossible to obtain a jury in the county free from exception. Of the seven witnesses examined on this motion, (four on the part of the prisoner and three on the part of the commonwealth,) there are only two, who express their belief of the possibility of obtaining a jury in the county. W. W. T. Cogbill, a witness examined in behalf of the-motion, “ thought the prospect of getting a jury free from exception in the county a very doubtful one, though he thought it possible that .one might be obtained;” and Alexander Jones, a witness for the commonwealth, expressed the belief that such a jury “ could be obtained, but not without considerable inconvenience and consumption of time;” whilst all the others are decided in the opinion that a jury could not be obtained in the county. They all concur in expressing the belief that *677 the great difficulty in procuring a jury in the county arose from the fact that the cause had been so long 'pending, and that the people had generally heard the testimony and the rumors about the case, and had made up their minds; that there was a general belief of the prisoner’s guilt, hut no prejudice against the prisoner or his cause independent of this belief; and one of the witnesses of the prisoner, to show that he was correct in supposing that there was no personal ill will against the prisoner, stated that he did not believe that there was one man in twenty or even in one hundred that knew the prisoner personally. And one of the witnesses on behalf of the commonwealth, Hobbs, stated that whilst there had been, and still continued to be, a general conviction of the prisoner’s guilt, there was then no excitement against the prisoner .and n© prejudice against him personally; but that on the contrary, there seemed to be, with some, a feeling of sympathy for him, owing, as he believed, to the development of the fact, during the trial-in November, by the testimony of Beid and Lipscomb, of the marriage of Beid and Mrs. Eobiou, which some believed was without the knowledge or consent of Wormeley. And another witness on the part of the commonwealth stated that he had seen lately no evidence of excitement against the prisoner, nor of any prejudice.against him personally; and that there were very few who knew anything about him. That the ease had been loag peuding, and that the people generally had made up their minds; but .that he had seen no evidence of any feeling that could possibly affect the minds of jurors coming from another county. That he had been the elerk of the county for several years, and at one time sheriff, and was extensively acquainted with the people: And in confirmation of his belief that there was no excitement against the prisoner, and indeed no great interest felt about his case, he stated the *678 fact that during the then present term, he had seen scarcely anybody attending court but those who had ■ been summoned.
It is clear that under the former laws such a motion, accompanied by such proofs, ought to have prevailed, in as much as the great improbability if not impossibility of obtaining a jury in the county is plainly shown. But can we say in the present state of the law that good cause was shown by the prisoner for a change of the venue ? Can we say that the court left the prisoner exposed to any improper hazard by refusing to send the case to another county, and instead thereof, ordering a jury to be summoned from another county? We think not. We cannot believe that there was danger of any manifestation of popular feeling or opinion likely to prejudice the prisoner’s cause in the minds of his triers; or of there being at the trial anything in the surrounding circumstances, which would not have left the witnesses entirely free to render •their testimony, the prisoner’s counsel free to uphold and maintain his defence, and the jury equally free calmly and conscientiously to render their verdict in the cause.
The third and twelfth causes of error are based* on decisions of the court refusing to grant two several motions of the prisoner for a continuance of his case; the first of which motions was made at the November term 1852, and the second at the special session of the court in January 1853. The first motion was founded on the absence of three witnesses, Junius L. Archer, Abner W. Trabue and Emily W.“ Robiou. On being required by the court to do so, the prisoner’s counsel stated what they expected to prove by these witnesses, and the prisoner by his affidavit verified the statement. It would seem at first view that, even though the court might have erred in refusing to continue the cause, on the prisoner’s motion, the prisoner could have no right *679 to complain of the judgment, in as much as the cause was postponed to a special term, owing to the inability of the court to finish the trial during the term. prisoner, however, insists that he has been injured by the refusal of the court to continue on his motion, because if a regular continuance had been granted, his trial, instead of taking place at the special session in January, could not have been had till the following regular term in May; and that he would thus have had an opportunity till that time to procure the attendance of one of the most important witnesses,. Emily W. Reid, (formerly Robiou,) and to have enjoyed whatever other advantages might have accrued to him or his cause by lapse of time.
As to the two witnesses, Archer and Trabue, there-is nothing in the course of the court with regard to the continuance by which the prisoner could be possibly injured, in as much as we find his affidavit for a continuance in January is based entirely on the absence of Emily W. Robiou and John Dunnaway. The fair inference is either that Archer and Trabue were* not in fact deemed material by the prisoner, or that-they were present, and that the- prisoner enjoyed the benefit of their testimony. As to Emily W. Reid, (Robiou,) waiving the consideration of the question whether the facts which, according to the statement, she was expected to prove, might not have been material to the prisoner’s defence, the enquiry arises, Was there due diligence ? Was-there a. prospect that the witness; would attend at the time to which it was proposed to-continue the cause? Was- the motion in fact submitted in good faith ? And. in. pursuing the last enquiry, we have the right to take a connected view of the prisoner’s course, as disclosed in the two bills of exceptions.
It appeal's from the testimony in behalf of his first motion, that Mrs. Reid left the state, about a fortnight *680 before the time appointed for the trial in November, and that she left with the full knowledge that she • would be wanted at the trial as a witness; for though it is proved by Lipscomb that he met her coming from the office of one of the prisoner’s counsel in the month of September, and that she stated she had consulted her counsel, who had informed her that she would not be wanting, the prisoner’s counsel all denied having given her such advice, and the counsel from whose office she was seen coming, stated that on the contrary he had told her expressly that she would be wanting. It is proved by Eeid, who had been jointly indicted with the prisoner and acquitted at the July term, and who had since intermarried with her, that he had carried her to North Carolina. He at first stated that he did not know where she was, and that he had seen her last in Eichmond; and that though possibly her attendance might be procured, he knew nothing particularly respecting it: Yet on further examination, he stated that a little more than two weeks before, he had canned her to Salem in North Carolina; that he left her there; and that he had not seen her or heard from her since, and knew nothing to the contrary of her being there still.. It was also proved by Lipscomb, on a re-examination, (who on the first examination had disclosed nothing more than that he had. carried her to Eichmond in September, and that she said she was going to Lynchburg and would be absent for some time, and the further fact of seeing her coming from the office of her counsel, and holding with her the conversation before mentioned,) that he had, about the 25th of October, furnished Eeid the means in part of going away, though he did not then know where they were going. ■
It appears from the bill of exceptions taken to the opinion of the court overruling the motion for a continuance in- January, that Emily W. Eeid was still. *681 absent, and it did not appear that sbe had been in the state since the preceding October. Keid being examined, stated that he supposed she was now unable to attend court in consequence of pregnancy, caused by her marriage to him in July last; and that her health had also been affected by the persecution and harassment to which she had been subjected before she went to North Carolina. But he also further stated that he had not seen her since October, when he carried her to Salem, North Carolina,, where she was still boarding, and where she had sisters at school. He also stated that he had written to her and had received two letters from her, the 2d on the 26th of December last; that about a month before the date of the statement he was then making, he had been informed by one of the prisoner’s counsel that she would be wanting as a witness at the then present term of the court, and that he had written to her to that effect; and on being asked what was her answer, he said, she stated in her answer that she had been advised by counsel it was unnecessary for her to attend. It is also certified by the court that the counsel for the prisoner declared in open court that they had given her no such advice.
Can any one read this history of the conduct of his witness, furnished by the prisoner, and doubt that it was influenced by motives, and looked to objects, growing out of and connected with the prisoner’s trial ? And can any one believe that it was designed to be prejudicial to the prisoner’s interest? We think not. We cannot believe that a daughter so situated, with her father in the custody of the law, charged with a capital offence, of which he had been once convicted by a jury of the country; an offence growing, (according to the statement of his counsel,) out of a quarrel, occasioned and provoked by unceasing injuries and wrongs inflicted upon her and her mother, by the man with whose murder he was charged, and she, the *682 witness by whom, according to the same statement, these facts and others deemed material to the defence, ■ were to be proved; we cannot believe that she would, within a few days of the period when he was again about to be exposed to the hazards of a trial, with a full knowledge that she would be wanting as a witness, thus leave the state on the eve of his trial, if she did not believe that such a course on her part would probably be productive of greater benefit to his cause than would be her then appearing and testifying in his behalf. Looking at the conduct of herself and husband in this particular, it is hard to conceive any other motive for it than the hope that it might procure a further delay of the prisoner’s cause, or otherwise lay the ground on which to raise some of the very questions in the consideration of which we are now engaged. To suppose that she was really in possession of testimony of probable materiality to the prisoner, and that she designed to withhold it from him at his ultimate trial, would be to impute to her a monstrous degree of filial impiety and ingratitude, a wanton disregard of the life of her father and protector, little short, if any, in moral turpitude and guilt, of the crime for the alleged commission of which he was about to be placed in jeopardy.
There is no positive testimony to connect the prisoner with this scheme. But what has been his course? Has it been that of a man who, about to enter upon a trial involving his character and life, was, in good faith, getting ready for it; who having a material witness, was really desirous that the witness should attend at the time appointed for the trial ? It does not appear that the marriage of his daughter with Reid was with his consent or knowledge, but it does appear from the testimony of Winfree the guard of the jail, that he had a conversation with him about the middle of October, in which he informed the prisoner of the report of the marriage, and that he - ap *683 peared much displeased, and indulged in some harsh expressions about Reid. But he expressed no feeling of resentment towards his daughter; and there is nothing to show why he might not have desired to see her; why he should not have still felt a parent’s interest in her plans of life; and most particularly, why he should not have desired to be informed whether her marriage would lead to any immediate change of residence or to any journey by herself and husband, likely to interfere with her attendance at the approaching trial. Yet in this conversation he makes no enquiry about her, and there is no proof that on any other occasion he had made such enquiry; or sent any letter or message to her. And in his affidavit on the first motion for a continuance, he is wholly silent as to when he was informed of her having left the state; abstains from any statement that her absence was without his knowledge; and does not state that he expected to procure her attendance at the next term of the court; nor indeed state any other fact from which it was he inferred that he did'so expect. And when his case again icame on for trial in January, he still made no affidavit with respect to the movements of his daughter; no affidavit of a belief that he could procure her attendance at another term, if a continuance should be granted; and there is still the absence of any proof of any enquiiy on his part about her, or of his having requested any friend to go after her, or of his having himself written or requested any friend to write to her and urge her attendance. The prisoner cannot complain of the application of the strictest rules of the law to motions made under such suspicious circumstances; and taking the omissions in the affidavits just mentioned in connection with these circumstances, and seeing that the court had no proof of any prospect of her attending at a subsequent term, we see no error in the judgment of the court in re *684 fusing the motion on either occasion, so far as it was based on the absence of Mrs. Reid. It is true that if the statement of Reid on the second application were alone to be looked to, the inference might be drawn that her continued absence was due to her inability to attend on account of her condition. But his conduct and statements in the case have been such as to entitle them to little weight; and in her own letter, in reply to his, informing her of the statement of counsel that she would be wanting as a witness, so far as he has disclosed its contents, we find that she places her absence on no such ground, but falsely says that she had been advised by the counsel that she would not be wanting. So far as the motion at January court depended on the absence of Dunnaway, we see no difficulty. Waiving any question of diligence as to him, it is plain that what he was expected to prove was not competent evidence. We perceive therefore no error of the court in respect to either of these motions.
We see nothing to impeach the propriety of the order made by the court at the termination of the November term, directing the sheriff of the county to summon from the city of Richmond thirty jurors and from the city of Petersburg the like number, to attend court at the first day of the special term in January. The order is stated to be based on the opinion of the court that qualified jurors not exempt from serving could not be conveniently found in the county, of whom to form a jury for the trial of the prisoner; and seems to be in exact conformity with the 10th section of ch. 208 of the Code. Had the venire been exhausted at an earlier day of the November term, and the order had been made for the attendance of the jurors at a subsequent day of the same term, there could have been no question of the right of the judge to make it; and there is nothing in the words of the *685 statute to restrict the right to make the order to such a case. The order does not conflict at all with the provisions of the 5th section of chapter 208, requiring the judge, when he appoints a special term, to prescribe in the order whether a grand jury or venire is to be summoned to attend the said term. The court, after appointing the term, does in effect prescribe at the foot of the order, that no venire is to be summoned to attend from the county; but that instead thereof, the sheriff is to summon jurors from Richmond and Petersburg. And we cannot conceive how the prisoner could be possibly injured by the court’s directing the sheriff to summon the jurors from two corporations at once, instead of one of them.
Nor can we see any force in the objection that is set forth, in the 8th cause of error, to the course of the court in permitting the jurors, who had been summoned and did not at first appear, but who subsequently appeared under a rule to show cause why they should not be fined, to be examined as to their qualifications. The jury was not yet complete, and the failure of these jurors to obey the summons of the court at first was a matter with which the prisoner had nothing to do. The causes of their default were matters into which the court would look in considering whether he should fine them; but it is not perceived how their attending on one day instead of another, having not been discharged from the summons, could affect the legality of their being placed on the jury, if in other respects found qualified.
Any decision sustaining an objection to the return on an original venire on the ground that fewer than the number of jurors required by the precept have been summoned, will be found to have no application to orders such as those referred to in the 9th assignment of errors. The law fixes the number of jurors who are to be summoned under such a venire; but in the *686 orders which the court issues to its officers to summon jurors from other counties, in the case contemplated by the Code, it is restricted to no specified number. The court may order any number it- may think necessary in order to form an unexceptionable jury; and if the sheriff from want of time or other cause, fails to summon the whole, no good reason is seen why the return should not stand good for as many as are summoned.
Without deciding whether Richard Coleman was a good juror or otherwise, we are of the opinion that there was nothing in the action of the court in respect to him of which the prisoner can complain here. Notwithstanding the court had overruled the prisoner’s objection, and he had excepted to the opinion, it was not too late for the court to reconsider; and it matters not whether the course of the court was changed by the motion of the prisoner or at the suggestion of the attorney for the commonwealth. The legal effect was the same as if the court had in the first instance sustained the prisoner’s objection to the juror.
The exceptions of the prisoner to two several decisions of the court overruling his challenges to the two jurors Davis and Brown, present questions which are of a much more serious character, and which have given rise to as frequent discussion, both at the bar and on the bench, as any that have occurred in the administration of criminal law. We do not deem it necessary to make an effort to reconcile the seeming conflicts of opinion that are to be found in the decisions of our courts ; nor do we think that the occasion calls for any very extended examination of the rules which are to govern, generally, the questions touching the nature of the opinion that will render a juror incompetent; the more especially as the whole subject has been recently very thoroughly considered in *687 the General court by one of the most learned and able jurists of the country;* and as the application of a few well settled principles will be found all sufficient for the decision of the precise questions before us.
It is well settled that the question as to the competency of the juror is to be tested by the character and force of the opinion which he has formed, and not by the occasion on which the opinion was formed, or the source from whence the information of the juror may have been derived. Still as it is natural to expect that the impression or opinion of the juror would be stronger or weaker, as the information or evidence on winch it is formed is more or less full and authentic, it often becomes necessary, where doubt is left from his statements as to the real force of his opinion, to look to his source of information, as a veiy important circumstance in explanation of this doubt. If upon the whole examination it appears that the opinion is decided or substantial, the juror is incompetent ; and on the other hand, if-the opinion appears to be merely hypothetical or so slight as that it would in all probability readily yield to the evidence, his competency is established. And if the opinion is founded upon mere rumor, the presumption in favor of the indifference and fairness of the juror, especially if supjiorted by the expression of a belief on his part that he could give the accused a fair and impartial trial, has in most cases led to decisions in favor of the competency of the juror, notwithstanding in some of those cases statements were made by the jurors which, if they had stood alone, would have indicated that the opinions formed were substantial and decided. The application of these.principles to the case of the juror Davis result in showing that he was clearly competent. He had had no conversation with any of the witnesses, or any of the jurymen who sat on the former *688 trial; nor had he read or heard any statement of the facts of the case; but what he had heard had been the opinions or conclusions of those with whom he had talked, without any statement of the facts on which their opinions were founded; but they gave some of the history of the parties. It will be seen that the impression or opinion which he had formed was founded upon the mere opinions of his acquaintances. Though these were acquaintances in whom he had confidence, and though he said that he had rather formed some opinion which it would require evidence to remove ; yet the statement taken- as a whole negatives the idea that the juror had made up his mind and prejudged the prisoner’s case.
As to the juror Brown, though in the latter part of his examination he does- state in answer to an enquiry whether his opinion “was not a decided and pretty substantial one,” that it was; yet when we look to the source of his opinion, the statements of a lady from the county, “ who did not profess to have any personal knowledge of the facts, but who, he believed stated truly as- far as she heard,” and allow due weight to his declaration of a belief that he could try the cause uninfluenced by those statements, we experience no difficulty in drawing from his whole examination the conclusion that his case belongs to the same class with that of the juror Davis, and think that he was properly accepted by the court as a fair and impartial juror.
On the trial the commonwealth endeavored to contradict James Reid, a witness for the prisoner, by showing that he had testified differently at the coroner’s inquest; and in order to lay the foundation for the introduction of the impeaching testimony, the witness was asked if he had not been examined as a witness at the inquest, and if he had not then made a certain statement as to the position of Robiou’s wagon at the time he was shot. To which he replied *689 that he had been so examined as a witness; but that he had not made the statement in question. The foundation being thus laid for the introduction of the testimony offered to contradict, it is not perceived on what ground it could be objected to. It is conceded by the prisoner’s counsel that if Royall could have stated what Reid had sworn in reference to the matter, from memory alone, or from memory aided by a reference to the written deposition of Reid which he had taken, it would have been competent for him to have made the statement. A deposition officially taken in a judicial proceeding, especially a deposition taken with such exceeding care and accuracy as the one offered; which after being written was read over to the witness, corrected at his request and then signed by him, would seem to furnish a much more authentic history of what had been stated by the-witness, than any that could be derived from the memoiy of witnesses, however veracious and retentive. It could not be read nor was it, as proof of the existence of any fact deposed to by the witness, but as proof of what the witness stated to be the fact in reference to a certain particular, for which purpose it was the best and safest testimony that could have-been resorted to.
There are other particulars in which the action of the court was excepted to by the prisoner, but no* reference is made to them in his petition, nor in the extended and able argument of his counsel here. W& deem it unnecessary to say anything in reference to them, farther, than that after a very careful examination of the whole record, we can discover nothing in the proceedings of which the prisoner can justly and legally complain;, and are of opinion to affirm the judgment.
Judgment affirmed;

 Lomax, judge, in Clore's Case, 8 Gratt. 606.